UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KOLCRAFT ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 C 03339 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHICCO USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kolcraft Enterprises owns United States Patent No. 7,376,993 (the '993 Patent), which covers methods and apparatuses related to infant play gyms.[1] With trial fast approaching, Defendant Artsana USA, Inc.,[2] has moved for summary judgment on certain issues of invalidity, infringement, and damages. R. 298, Mot. Summ. J.[3] Kolcraft responds that genuine issues of material fact preclude summary judgment on any issue. R. 316, Pl. Resp. Br. For the reasons stated below, the motion for summary judgment is denied in large part and granted only as to a specific limitation on willful infringement.

---

[1]The Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331, 1338.
[2]Artsana was formerly known as Chicco, USA, Inc., which is how it is referred to in the caption. Mot. Summ. J. at 1. The Court will continue to refer to the Defendant as "Artsana," the name that the parties have used throughout the litigation.
[3]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

1

# I. Background

The '993 patent covers methods and apparatuses related to infant play gyms. Play gyms are arches from which toys dangle. '993 Patent col. 1 ll. 53-62. The play gym described in the '993 patent can be suspended above a mat, a play yard, or a bassinet. '993 Patent col. 2 ll. 26-39. At issue in the summary judgment motions are Claims 28-31, which are method claims, and Claim 20, which is an apparatus claim. The Court previously issued opinions construing these claims. R. 216, First Claim Const. Op.; R. 285, Second Claim Const. Op.

Claim 28 describes:

A method comprising:

> securing a play gym at least partially above at least one of a bassinet and a play yard;
>
> removing the play gym from the at least one of the bassinet and the play yard;
>
> securing the play gym to a mat apart from the play gym and the bassinet;
>
> removing the play gym from the mat; and
>
> collapsing the play gym, wherein collapsing the play gym comprises:
>
> pulling a leg of the play gym in a direction away from a hub; and
>
> pivoting the leg into a stored position.

'993 Patent col. 10 ll. 6-18. Claims 29-31 depend on Claim 28, and describe specific methods of collapsing the play gym for storage. *Id.* col. 10 ll. 19-27.

Claim 20, on the other hand, describes:

an apparatus comprising:

> a floor mat;
>
> a play gym to suspend an object above the floor mat;
>
> at least one connector to couple the play gym to the floor mat; and
>
> at least one fastener to couple the floor mat to at least one of a play yard and a bassinet,
>
> wherein the at least one connector comprises a plurality of connectors, and the play gym comprises:
>
>> a hub; and
>>
>> at least two legs, each of the legs having a first end coupled to the hub and a second end dimensioned to be removably coupled to a respective one of the connectors, wherein the at least two legs are pivotably coupled to the hub,
>
> wherein the connectors are pivotably coupled to the mat.

R. 247, Def. Claim 20 Claim Const. Br. at 3.[4]

The '993 patent was issued in May 2008. DSOF ¶ 34.[5] At the time, Kolcraft was not selling any products that practiced the patent claims, and it has not sold any since. DSOF ¶ 35. Meanwhile, Artsana had been selling the accused devices (a play yard, bassinet, and toy gym) since 2005. DSOF ¶¶ 3, 36. Artsana maintains that it

---

[4]Claim 20 was amended during reexamination proceedings, so the text of the current Claim 20 is slightly different than the text that appeared in the original patent. Def. Claim 20 Claim Const. Br. at 2-3.

[5]Abbreviations for citations to the parties' Local Rule 56.1 Statements are as follows: "DSOF" for Artsana's Statement of Facts [R. 303], "PSOF" for Kolcraft's Statement of Additional Facts [R. 319]; "Def. Resp. PSOF" for Artsana's Response to Kocraft's Statement of Facts [R. 335]; and "Pl. Resp. DSOF" for Kolcraft's Response to Artsana's Statement of Facts [R. 319]. Both parties also filed sealed versions of their statements of facts and certain exhibits; citations to the sealed exhibits are noted by docket number and a (sealed) parenthetical. The specific information disclosed in the opinion does not reasonably appear to warrant sealing.

did not know about the '993 patent until Kolcraft filed this lawsuit in June 2009. DSOF ¶ 38. Kolcraft, on the other hand, insists that it notified Artsana of the patent "several months" before filing suit. PSOF ¶ 29; PSOF Exh. M, Koltun Decl. ¶¶ 5-7.

Artsana responded to Kolcraft's lawsuit by filing a request for *inter partes* reexamination of all claims of the '993 patent. DSOF ¶ 43. The PTO proceedings are described in detail in the first claim construction opinion. First Claim Const. Op. at 2-4. The upshot was that the Patent Trial and Appeal Board affirmed the patentability of Claims 28-31, and Kolcraft amended Claim 20 to be an independent claim. DSOF ¶ 48.

In addition to challenging the '993 patent's validity, Artsana made several changes to its own products, purportedly to avoid infringement. *See* R. 302, Def. Br. at 2-3; DSOF ¶ 42. The parties refer to the original version of Artsana's accused product as the "Original Design." *See* Def. Br. at 2. Artsana eventually issued a "First Redesign" and a "Second Redesign," which made changes to the connectors on the mat and to the play gym hub. *See id.* at 2, 10-11; DSOF ¶¶ 15-25.

## II. Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable

inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

#### A. Infringement of Claim 20

First up is Artsana's argument that its accused play yards do not infringe Claim 20 of the '993 patent. Artsana argues that Claim 20 is not infringed because the "connectors" in the accused devices are not "pivotably coupled to the mat." Def. Br. at 4-6. In its opinion construing Claim 20, the Court held that the phrase "the connectors" was a generic term encompassing each of the "plurality of connectors" that make up the compound connector described in Claim 20. Second Claim Const. Op. at 9-10. Each of these connectors must be pivotably coupled to the mat. *Id.* Pivotably coupled means linked, connected, or fastened such that the connector can rotate, turn, or move around a fixed point. *Id.* at 12.

5

Artsana's Original Design has a connector comprised of a fabric pocket fastened to the mat via a single seam. A snap is sewn to the pocket. DSOF ¶ 8. The First and Second Redesigns jettisoned the fabric pocket in favor of a fabric strap attached to a plastic D-ring. The fabric strap is attached to the bottom of the mat with a square of stitching. DSOF ¶ 16. Images of the two connector designs are reproduced here:[6]



---

[6]The images are taken from Artsana's Statement of Facts. DSOF ¶¶ 8, 16. The connectors in the First and Second Redesigns were the same. *See* DSOF ¶ 27.



A reasonable jury could find that both the Original and the First and Second Redesigns had connectors that are, under the pertinent claim construction, pivotably coupled to the mat. In the Original Design, the fabric pocket is sewn so that it can hinge back and forth over the single line of stitching attaching it to the mat. *See* Second Claim Const. Op. at 6-7 (noting that couplings that hinge or bend could be considered pivotable). The snap, which is attached to the pocket, is also capable of pivoting over the line of sewing on the mat. Artsana argues that the snap is not "coupled" (that is, attached or fastened) to the mat, but that is incorrect: the snap is coupled to the mat by the fabric pocket. Nothing in the language of Claim 20 requires the connectors to be *directly* coupled to the mat; an indirect coupling is enough as long as the connector is attached or fastened to the mat.

A jury also can find that the connectors in the First and Second Redesigns are pivotably coupled to the mat. Although one end of the fabric strap is sewn to the mat

7

and cannot pivot, the fabric loop at the end of the strap is capable of bending over the fixed line of stitching on the mat. That is a pivotable coupling (or so a jury can reasonably find). The D-ring connector pivots over that same line of stitching, and is coupled to the mat by the fabric strap. So a jury could find that all three accused devices have connectors "pivotably coupled" to the mat within the meaning of Claim 20.

Next, Artsana argues that another limitation of Claim 20—"the at least two legs are pivotably coupled to the hub"—is not present in the Second Redesign.[7] Def. Br. at 6-8. In the Second Redesign, the legs of the play gym are attached to the play gym hub with fabric straps. DSOF ¶ 21. The hub has four openings that are configured to receive the legs. *Id.* ¶ 22. When a leg is inserted into the corresponding opening, it is held in position and is not movable. *Id.* ¶ 23. When the legs are removed from the openings, they remain attached to the hub via their respective fabric straps. *Id.* ¶ 24. The design is depicted in the set of pictures below:[8]

---

[7]Artsana does not dispute that this limitation is present in the Original Design and the First Redesign.
[8]DSOF ¶ 21.



As discussed in the second claim construction opinion (as well as earlier in this opinion in the context of the connectors), "pivotably coupled" means attached or fastened such that the leg can rotate, move, or turn about a fixed point. Second Claim Const. Op. at 11-12. Applying this definition to the Second Redesign, a reasonable jury could find that the legs are pivotably coupled to the hub. The images show that each of the fabric straps is attached to a fixed point on the hub. When the legs are removed from their cavities, they are attached to the hub by the fabric straps, which allow the legs to rotate, turn, or move around that fixed point. It is true that the legs *could* move in other ways while attached to the fabric strap—they could be moved towards the hub or away from it without pivoting, for example. It is also true that the legs are not *always* capable of pivoting: when they are in their cavities they are fixed

in position. But the claim language does not foreclose the possibility that the legs could move in other ways, or that they could be temporarily fixed in position. It only requires that the legs be fastened such that they are *capable* of rotating, turning, or moving around a fixed point. *See* Second Claim Const. Op. at 6. The legs in the Second Redesign are capable of rotating around a fixed point, so a reasonable jury could find that the legs in the Second Redesign are pivotably coupled to the hub. Artsana's motion for summary judgment of noninfringement of Claim 20 is denied.

### B. Infringement of Claims 28-31

Artsana tries another version of the same argument for claims 28-31. Specifically, Artsana argues that the legs in the Second Redesign are not capable of "pivoting … into a stored position" as required by claims 28-31. Def. Br. at 8-9. As explained above, that argument does not work. The legs in the Second Redesign are capable of pivoting around the fixed point where the fabric strap is attached to the hub. To store the play gym, a user could pull the legs out of their cavities and pivot them around the hub and into the stored position. So the Second Redesign is capable of practicing the method step of "pivoting the leg into a stored position."

### C. Willful Infringement

Next, Artsana asks for summary judgment against Kolcraft's allegation of willful infringement. As a practical matter, willfulness is important because a patent owner may be awarded enhanced damages for willful infringement. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1930 (2016). Enhanced damages require proof of *subjective* willfulness—that is, that the defendant acted despite a risk of infringement

that was either known or so obvious that it should have been known. *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (quoting *Halo*, 136 S. Ct. at 1930).

Artsana argues that it cannot be liable for enhanced damages for infringement before June 3, 2009 (the date this lawsuit was filed) because it did not know about the patent before that date. Def. Br. at 17. But according to Kolcraft, Kolcraft's CEO Thomas Koltun called his Artsana counterpart, Greg Mansker, several months before the lawsuit and informed him of the patent. PSOF Exh. M, Koltun Decl. ¶ 5. Koltun accused Artsana of infringement, and offered to negotiate a license. PSOF ¶ 29; PSOF Exh. M, Koltun Decl. ¶¶ 5-7. Crediting Koltun's testimony (which the Court must at this stage), Artsana was aware of the '993 patent and its own potential infringement "several months" before June 3, 2009. If that is true, Artsana is potentially liable for enhanced damages dating from the time of Koltun's phone call. But Artsana's summary judgment motion is granted in part: Kolcraft points to no evidence that Artsana knew about the patent *before* Koltun's phone call, *see* Pl. Resp. Br. at 11-12, so there can be no enhanced damages for any infringement before that date.[9] And, at trial, Kolcraft will have the burden of proving when this phone call took place.

---

[9]Kolcraft does argue that a jury could infer knowledge of the '993 patent even in the absence of Koltun's testimony, but the evidence cited in support of that assertion merely establishes that Artsana knew that Kolcraft produced a competing play gym, not that Kolcraft had obtained a patent on the technology. *See* R. 318, PSOF ¶ 30 (sealed). The possible exception is mention of the "kolcraft patent (that covers gym sold with the playard)" in an Artsana meeting note. R. 318, PSOF Exh. N at CHI-00040100 (sealed). But the notes from that meeting are dated December, 11 2009—months after Kolcraft filed its lawsuit in June 2009. *See* R. 335, Def. Resp. PSOF ¶ 30. So that meeting note does not establish Artsana's pre-suit knowledge of the patent. Nor does a 2004 email mentioning a Kolcraft patent help

11

Finally, although Artsana argues that the evidence is not sufficient to prove willfulness even after June 3, 2009, that argument must be rejected. It is clear that Artsana knew about the patent and the potential infringement, and that Artsana continued to sell the accused products anyway. It is true that Artsana challenged the validity of the patent in an *inter partes* reexamination proceeding, and that Artsana redesigned its products to (purportedly) avoid infringement. *See* Def. Br. at 10-11. To be sure, these are factors that a jury might find indicate good faith on Artsana's part. But a jury could also find that these were merely post-hoc litigation strategies to try to avoid enhanced damages. *See, e.g.*, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1340-41 (Fed. Cir. 2016) (holding that the defendant "cannot insulate itself from liability for enhanced damages by creating an (ultimately unsuccessful) invalidity defense for trial"). Because a jury could conclude that Artsana acted willfully, summary judgment is denied on the willfulness issue for infringement that took place after Koltun's phone call to Mansker.

## D. The Marking Statute

Next up is Artsana's argument that Kolcraft is disqualified from seeking damages prior to June 2009 under the patent marking statute, 35 U.S.C. § 287(a). The marking statute provides that "in the event of failure [ ] to mark, no damages shall be recovered … except on proof that the infringer was notified of the

---

Kolcraft establish earlier willful infringement. *See* R. 318, PSOF Exh. P (sealed). The '993 patent was not issued until 2008, so mentions of a Kolcraft patent (which may or may not have been the then-pending '993 patent application) in a 2004 email do not establish that Artsana knew that the '993 patent had been issued.

12

infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice." *Id.* Artsana argues that Kolcraft did not mark its products as patented and did not notify Artsana of the infringement until the current lawsuit, thus limiting Kolcraft's damages. Def. Br. at 17-18.

There is a problem with that argument. Artsana admits that Kolcraft was not selling products that practiced the claims of the '993 patent by the time the patent was issued. DSOF ¶ 35. Although Kolcraft had *previously* sold a play gym set (the "Travelin' Tot"), it stopped selling that product before the patent issued. Pl. Resp. Br. at 17; DSOF ¶ 35; Pl. Resp. DSOF ¶ 35. The marking statute's limitation on damages does not apply when there are no products to mark. *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1219-20 (Fed. Cir. 2002) (citing *Wine Ry. Appliance Co. v. Enter. Ry. Equip. Co.*, 297 U.S. 387, 394-95 (1936)). Kolcraft was not producing any patented products when the patent was issued, and did not produce any afterwards, so it could not have marked any products as patented. DSOF ¶ 35. *Lambda Optical, LLC v. Alcatel-Lucent USA Inc.*, 2015 WL 5470175 (D. Del. July 29, 2015), which Artsana cites in support of its contention that Section 287 should nonetheless apply, is distinguishable. In *Lambda Optical*, the plaintiff continued to sell unmarked products *after* obtaining a patent. *Id.* at *2-3. *Lambda Optical* held that the purposes of the marking statute were served by disqualifying patentees who had previously failed to mark their products from recovering damages, even for the time periods that they sold marked products: "if a patentee-plaintiff were able to

13

return to the more favorable status of a non-producing patentee simply by halting production of unmarked product, this would not encourage patentees in the first instance to give notice to the public that the article is patented." *Id*. at *5 (cleaned up).[10] Kolcraft, on the other hand, did not sell any patented products after the patent was issued, so it never had an opportunity to give the public notice of the patent by marking its products. Section 287 does not limit Kolcraft's damages.

### E. Damages for Method Claims

Artsana argues that no damages can be awarded for infringement of the method claims (Claims 28-31) because there is "no evidence to quantify the extent to which the accused method is actually practiced by users of the Accused Products." Def. Br. at 17-20. It is true that Kolcraft has the burden of proving damages, and that it would be improper for the jury to award damages based merely on "speculation or guesswork." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1335 (Fed. Cir. 2009). But there is no requirement that the plaintiff must provide direct evidence of every instance of infringement to be awarded damages. *See id.* at 1334. In fact, depending on the industry and the type of invention, a hypothetical reasonable royalty might not be tied strictly to the frequency of use of the patented invention. *Id.*

In this case, Kolcraft has provided testimony from at least one customer who practiced the patented method. PSOF Exh. S. What's more, common sense supports Kolcraft's argument that the appeal of the accused products is their ability to practice

---

[10]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

14

the methods described in Claims 28-31. *See* PSOF ¶ 37. The point of the accused play yards (or so a reasonable jury could find) is to give child caregivers the flexibility to use the play gym along with a play yard or a bassinet—otherwise customers could just buy a standalone play yard or bassinet. *See* PSOF Exh. M, Koltun Decl. ¶ 12. It also appears that Kolcraft will present an expert on damages to testify about the basis for Kolcraft's damages calculation. R. 304, Artsana's Mot. in Limine No. 1. Although that expert's methods might be open to debate, *see id.*, that is a question to be addressed on Artsana's *Daubert* challenge, not on summary judgment with a general assertion that there is "no evidence" to support a damages award. At this stage, there is some evidence to support a damages award for infringement of Claims 28-31, so Artsana's motion for summary judgment to knock them out entirely is denied.

**F. Inventorship**

Lastly, Artsana argues that the '993 patent is invalid because it does not identify the correct inventors. Failure to name the correct inventors can render a patent invalid. *In re VerHoef*, 888 F.3d 1362, 1365 (Fed. Cir. 2018); 35 U.S.C. § 102(f) (2006). Inventors are people who conceived of the subject matter at issue. *VerHoef*, 888 F.3d at 1335. To be considered an inventor, an individual must "(1) contribute in some significant manner to the conception or reduction to practice of the invention, (2) make a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) do more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1351 (Fed. Cir. 1998).

15

In inventorship-disclosure disputes, the inventors named on the issued patent are assumed to be correct, and the challenger has the burden of proving otherwise by clear and convincing evidence. *Cumberland Pharms. Inc. v. Mylan Institutional LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017).

Artsana asserts that a group of people associated with a company called Lerado should have been listed as inventors on the patent. Def. Br. at 21-23. Lerado is a manufacturing company that produced prototype play gyms for Kolcraft. *See* DSOF ¶¶ 67-72. Artsana also argues that one of the people who was actually listed as an inventor on the patent, Joseph Sejnowski, should not have been counted as an inventor. Def. Br. at 20-21. At this point, genuine issues of material fact preclude summary judgment on either theory.

First, Kolcraft has evidence that the Lerado employees did no more than execute the directions of Pete Myers, one of the named inventors. Myers testified that he and Sejnowski conceived of the invention, and that Lerado was only responsible for manufacturing samples of the product at his direction. *See* PSOF ¶¶ 20-28. Of course, that might not be true—one of the Lerado employees assigned to the Kolcraft project testified that Lerado did a significant amount of inventive work, especially surrounding the development of the play gym hub. *See* R. 301, DSOF Exh. 38, Cheng Aff. ¶¶ 19-30 (sealed). But at this stage, the Court cannot resolve credibility disputes. It will be up to the jury to decide whether Myers is credible, and whether the inventive work allegedly performed by the Lerado employees rose to the level of inventorship.

Fact issues likewise prevent summary judgment on the issue of Sejnowski's inventorship. Myers testified that Sejnowski helped "evolve the idea [for the play gym] in both rendering form and just flushing out the concept." PSOF Exh. E, 2012 Myers Dep. 58:8-9. According to Myers, Sejnowski helped to take the invention from a mere idea to a fully developed plan. *See id*. at 82:23-83:8; PSOF ¶ 28. In other words, Sejnowski contributed to the conception of the invention. *See Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223, 1227-28 (Fed. Cir. 1994) (noting that conception is complete when "the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation"). Other evidence, including a work invoice and a drawing of the invention, tend to confirm that Sejnowski contributed to the conception of the invention. PSOF ¶ 28; DSOF Exh. 36; R. 301, DSOF Exh. 34 (sealed). A jury could believe Myers's testimony and the other evidence and conclude that Sejnowski was properly joined as an inventor. Artsana's motion for summary judgment of invalidity is denied.

## IV. Conclusion

For the reasons stated above, Artsana's motion for summary judgment is denied, except as to recovery for willful-infringement damages before Koltun's phone call to Artsana's CEO. Now that the summary judgment stage is over, the Court directs the parties again to engage in settlement negotiations, although the negotiations must fit within the time frame of the trial schedule. Each side still bears sufficient liability and damages risk that a settlement would be the sensible solution.

The parties also ought to avoid the certainty (not just a risk, the certainty) of attorneys' fees and costs, as well as the distraction of having to prepare for trial testimony (and then actually testify), which takes time away from the party's core business mission. The counsel for both sides are directed to show this opinion and this negotiations directive to their respective clients.

                                      ENTERED:

                                                s/Edmond E. Chang
                                        Honorable Edmond E. Chang
                                        United States District Judge

DATE: July 6, 2018