|  |  |  |
|---|---|---|
| KOLCRAFT ENTERPRISES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | No. 09-CV-03339 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CHICCO USA, INC. d/b/a ARTSANA USA INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kolcraft Enterprises owns United States Patent No. 7,376,993 (the '993 Patent), which covers methods and apparatuses related to infant play gyms. Kolcraft accused Artsana USA, Inc. of infringing this patent with its own line of infant play gyms. After many years of litigation, including before the Patent & Trademark Office, the parties took the case to trial in August 2018. The jury returned a verdict in favor of Kolcraft on all claims and awarded $3,245,213.10 in damages. Artsana now moves for judgment as a matter of law, or, in the alternative, a new trial. For its part, Kolcraft moves for a permanent injunction, prejudgment interest, enhanced damages, attorneys' fees, and post-judgment interest. For the reasons explained below, Artsana is denied judgment as a matter of law. The Court also denies Artsana's motion for a new trial, but the motion does present a very close question on whether to remit the damages award. Ultimately, the Court concludes no. Kolcraft's motions for a permanent injunction, prejudgment interest, and post-judgment interest are all

granted. But the Court denies Kolcraft's motions for enhanced damages and attorneys' fees.

## I. Background

### A. The '993 Patent

Kolcraft, a manufacturer of baby products, began developing its Travelin' Tot play gym and play-yard product in October 2001. Trial Tr. at 150:21-151:3. To state the obvious (at least to parents), play gyms are arches from which toys dangle. R. 438.6, '993 Patent col. 1 ll. 53-62. Two Kolcraft employees—Pete Myers and Joe Sejnowski—were initially tasked with designing the product. Trial Tr. at 151:19-23. According to Kolcraft's President and CEO, Tom Koltun, Myers came up with the idea to give the play gym four legs that were all connected to a central hub, which allowed the user to fold the legs down and place the play gym into a carry bag for easy transportation. *Id.* at 153:6-16. The play gym could also be connected to a play yard, a play mat, or a bassinet, which was a unique combination of features in the market. *Id.* at 154:1-9. Kolcraft used a Chinese manufacturer, Lerado, to manufacture the product. *Id.* at 186:18-23. The Travelin' Tot launched in December 2002. *Id.* at 153:22-25.

Later on, Kolcraft decided to pursue a patent for the Travelin' Tot product and filed an application in May 2003. *Id.* at 155:6-24, 156:9-11. The application listed both Myers and Sejnowski as inventors. *Id.* at 157:7-18. Kolcraft added the words "patent pending" to the product's packaging, *id.* at 158:14-18, although the '993 patent did not issue until May 2008, *id.* at 156:12-13. But by that point, Kolcraft had pulled the Travelin' Tot product from the market. *Id*. at 158:11-13.

The '993 patent included 31 claims, although only Claims 28-31 and Claim 20 are at issue in this case. Claim 28 describes a method for using the play gym, specifically:

A method comprising:

> securing a play gym at least partially above at least one of a bassinet and a play yard;

> removing the play gym from at least one of the bassinet and the play yard;

> securing the play gym to a mat apart from the play gym and the bassinet;

> removing the play gym from the mat; and

> collapsing the play gym, wherein collapsing the play gym comprises:

> pulling a leg of the play gym in a direction away from a hub; and

> pivoting the leg into a stored position.

'993 Patent col. 10 ll. 6-18. Claims 29-31 depend on Claim 28, and describe specific methods of collapsing the play gym for storage. *Id*. col. 10 ll. 19-27.

Claim 20, on the other hand, describes an apparatus (rather than a method), specifically:

an apparatus comprising

> a floor mat;

> a play gym to suspend an object above the floor mat;

> at least one connector to couple the play gym to the floor mat; and

> at least one fastener to couple the floor mat to at least one of a play yard and a bassinet,

wherein the at least one connector comprises a plurality of connectors, and the play gym comprises:

a hub; and

at least two legs, each of the legs having a first end coupled to the hub and a second end dimensioned to be removably coupled to a respective one of the connectors, wherein the at least two legs are pivotably coupled to the hub,

wherein the connectors are pivotably coupled to the mat.

R. 247, Def. Claim 20 Claim Const. Br. at 3.[1]

## B. Artsana's Original Lullaby Play Gym

In 2003, a rival manufacturer of baby products, Artsana (doing business as Chicco at the time), decided to look into designing and producing its own play yard. Trial Tr. at 502:3-503:1. It reached out to Lerado for help because Mark Messner, the Vice President of Marketing and Product Development at Chicco, *id.* at 499:23-25, had previously worked with the company on various stroller designs for Chicco, *id.* at 504:7-10. Messner was aware that Lerado was designing products for other companies at the time. *Id.* at 505:4-14. After Messner reached out, Lerado employees showed him a design for a play yard that he believed to have been created by Lerado. *Id.* at 505:15-20. The Lerado employees referred to the design as an "open item," which, to Messner, meant any customer who wanted to use the design could purchase it. *Id.* at 505:15-20, 506:18-25. Artsana first started selling its play yard—the Lullaby—in 2005. *Id.* at 507:5-7.

---

[1]Claim 20 was amended during reexamination proceedings, so the text of the current Claim 20 is slightly different than the text that appeared in the original patent. Def. Claim 20 Claim Const. Br. at 2-3.

The parties dispute when Kolcraft first notified Artsana that it believed the Lullaby was infringing the '993 patent. Artsana asserts that it was first notified when Kolcraft served its Complaint in June 2009. Trial Tr. at 507:8-22. Kolcraft, on the other hand, put forth evidence that Kolcraft CEO Tom Koltun called Artsana's CEO, Greg Mansker, several months before the lawsuit was filed—in March or early April 2009—to give him a "heads up" that Kolcraft believed that the Lullaby was infringing the patent. *Id.* at 159:13-161:15. Koltun testified that he told Mansker he should look into licensing the product from Kolcraft. *Id.* at 169:1-10. According to Koltun, Mansker eventually called him back and told him Artsana's lawyers advised against licensing, but also that he wanted to avoid litigation. *Id.* at 168:2-169:10. Koltun testified that, after that conversation, he felt like he had no choice but to sue Artsana. *Id.* at 169:11-13.

## B. The 2009 Lawsuit and Fallout

Kolcraft sued both Artsana and Graco (another manufacturer of baby products) for patent infringement in June 2009. R. 1, Compl. Koltun explained at trial that Kolcraft discovered Graco's infringing product, Baby Einstein, after it began investigating the market for similar products following his conversation with Koltun. Trial Tr. at 170:12-23. The Complaint initially accused Artsana of infringing claims 1-12 and 18-21, while it accused Graco of infringing claims 22 and 23. Compl. ¶¶ 8, 9. Shortly after the suit was filed, Kolcraft and Graco settled and negotiated a license for the '993 patent, which included a 5% royalty on the allegedly infringing Baby Einstein product. Trial Tr. at 171:8-18. Artsana, on the other hand, requested that the Patent & Trademark Office (PTO) reexamine the validity of Kolcraft's patent,

which delayed the litigation between the parties. *Id.* at 177:19-23. The Court detailed the lengthy procedural history of the reexamination process in the first claim construction opinion. R. 216, 9/2/16 Claim Const. Order at 2-4. To summarize, the Patent Trial and Appeal Board eventually affirmed the patentability of Claims 28-31 and Kolcraft amended Claim 20 to be an independent claim. *Id.* In April 2012, Kolcraft issued its Initial Infringement Contentions in this case, alleging that in addition to the claims originally asserted in its Complaint, Artsana had also infringed Claims 28-31. *Id.* at 3.

At the same time as the PTO was reexamining the '993 patent, Artsana made several changes to the "Original Design" of the Lullaby product, purportedly to avoid infringing the '993 patent. These changes are described and depicted below:

| Model | Exh.[2] | Description | Images |
|-------|---------|-------------|--------|
| Original Design | PTX-7 | PTX-7 includes a hub and four legs. The legs are coupled to the hub via a securing pin. The leg connects to the floor mat via the opposite end. The top side of the floor mat includes fabric pockets that each receive a separate leg. The leg is secured via a snap connection.<br><br>R. 301, Def.'s SOF ¶¶ 8-10 |  |

[2] This refers to the exhibit number used at trial for each version of the design.

| Model | Exh.[2] | Description | Images |
|-------|---------|-------------|--------|
| First Redesign | DTX-296 | DTX-296 includes a hub and four legs. It includes the same hub that was used in PTX-7, meaning the legs are coupled to the hub via a securing pin. This redesign replaced the snap connectors with hook and latch fasteners. It also replaced the fabric pockets with D-rings held within the folds of fabric straps. The legs connect to the mat by passing the hook and loop fastener on the end of the leg through the opening of the D-ring and folding the leg's fastener back upon itself. <br><br> *Id.* ¶¶ 15-17 |  |

| Model | Exh.[2] | Description | Images |
|-------|---------|-------------|--------|
| Second Redesign | PTX-8, PTX-9 | PTX-8 and PTX-9 have a redesigned hub that eliminated the securing pin used in earlier designs. The legs can be removed from their locked position in the hub but remain attached through tethers between the sleeves encasing the legs and the bottom of the hub. It incorporated the same type of connection between the legs and the mat as DTX-296.<br><br>*Id.* ¶¶ 20-26 |  |

| Model | Exh.[2] | Description | Images |
|-------|---------|-------------|--------|
|       |         |             |  |

Despite these changes, Kolcraft proceeded with the litigation and the case eventually went to trial in the fall of 2018. Kolcraft argued at trial that the original Lullaby design, as well as all of the redesigns, infringed Claims 20 and 28-31 of the '993 patent. Trial Tr. at 108:22-109:4. Kolcraft also argued that Artsana induced its customers to infringe Claims 28-31, *id.* at 109:15-17; Artsana contributed to that infringement, *id.* at 110:1-3; and Artsana infringed the patent willfully, *id.* at 110:19-20. Both parties presented fact and expert witnesses at trial, including damages experts. Both of the damages experts opined on a hypothetical reasonable royalty rate to award Kolcraft if the jury found Artsana liable. Kolcraft's expert estimated a reasonable royalty rate of 5.8%. *Id.* at 578:21-24. Artsana's expert estimated a reasonable royalty rate of 2% at the very, very most. *Id.* at 870:17-20.

At trial's end, the jury found for Kolcraft on all claims, concluding that all of the accused products infringed each asserted Claim of the '993 patent. R. 413, Verdict Form. Indeed, the jury found in favor of Kolcraft on all 55 special interrogatories. *Id.* It awarded Kolcraft $3,245,213.10, which equates to a 7% royalty rate on Artsana's sales of the Lullaby products. Verdict Form at 7. The parties now bring a series of post-trial motions. Artsana asks for judgment as a matter of law under Rule 50 on all of Kolcraft's claims. R. 398, Def.'s 50(a) JMOL; R. 407, Def.'s Renewed 50(a) JMOL; R. 432, Def.'s 50(b) JMOL. In the alternative, Artsana requests a new trial under Rule 59. R. 430, Def.'s Mot. New Trial. For its part, Kolcraft has filed motions for a permanent injunction, R. 438, Pl.'s PI Mot., enhanced damages and attorney's fees,

R. 440, Pl.'s Mot. Enhanced Damages, and prejudgment interest, R. 423, Pl.'s Mot. Prejudgment Int.

## II. Legal Standards

### A. Rule 50

Under Rule 50(a) of the Federal Rules of Civil Procedure, a district court may enter judgment against a party who has been fully heard on an issue during a jury trial if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The Court "must construe the facts strictly in favor of the party that prevailed at trial." *Schandelmeier–Bartels v. Chi. Park Dist.*, 634 F.3d 372, 376 (7th Cir. 2011). "Although the court examines the evidence to determine whether the jury's verdict was based on that evidence, the court does not make credibility determinations or weigh the evidence." *Id.* And the Court "can strike a piece of evidence from its weighing process only if reasonable persons could not believe it because it contradicts indisputable physical facts or laws." *Mejia v. Cook County, Ill.*, 650 F.3d 631, 633 (7th Cir. 2011) (cleaned up).[3] Put another way, "[d]iscrepancies arising from impeachment, inconsistent prior statements, or the existence of a motive" will not render testimony excludable. *Whitehead v. Bond*, 680 F.3d 919, 926 (7th Cir. 2012) (cleaned up).

---

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citaions have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

## B. Rule 59

A court may grant a motion for a new trial under Rule 59 if the verdict is against the clear weight of the evidence or the trial was unfair to the moving party. *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011). "In passing on a motion for a new trial, the district court has the power to get a general sense of the weight of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Mejia*, 650 F.3d at 633 (cleaned up). The district court, however, may not simply substitute its judgment for the jury's. "Since the credibility of witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Whitehead*, 680 F.3d at 928. The standard for granting a new trial is thus relatively high and a motion requesting as much will only be granted "when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* at 927-28.

## C. Permanent Injunction

"A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010)

(cleaned up). These principles apply equally to disputes arising under the Patent Act. *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## D. Prejudgment Interest

If a defendant is found liable for infringement, the Court will often award prejudgment interest, which is the rule, not the exception. *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56 (1983). "An award of prejudgment interest serves to make the patentee whole because the patentee also lost the use of its money due to infringement." *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern, Inc.*, 246 F.3d 1336, 1361 (Fed. Cir. 2001). Any justification for withholding the award must bear a relationship to the award of prejudgment interest itself. *Gen. Motors*, 461 U.S. at 655.

## E. Enhanced Damages, Fees, and Post-Judgment Interest

Finally, § 284 of the Patent Act allows courts to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. District Courts, then, have discretion to decide whether to award enhanced damages and in what amount. *Halo Elecs. v. Pulse Elecs.*, 136 S.Ct. 1923, 1931-32 (2016). The Supreme Court, though, has clarified that enhanced damages are reserved for "egregious cases of culpable behavior." *Id.* at 1932. The Court also has discretion to award attorneys' fees and post-judgment interest. 35 U.S.C. § 285; 28 U.S.C. § 1961.

## III. Analysis

### A. Defendant's Rule 50 Motions

Artsana currently has three motions for judgment as a matter of law pending before this Court. First, Artsana made two pre-verdict motions under Rule 50(a), R.

398 and R. 407, on which the Court reserved ruling. Second, Artsana brought one post-verdict motion under Rule 50(b). R. 432. Typically, the issues addressed in a party's post-verdict motion mirror those addressed in its pre-verdict motion, because a post-verdict Rule 50(b) motion "can be granted only on grounds advanced in the pre[-]verdict motion." Fed. R. Civ. P. 50, Advisory Comm. Notes. 2006 Am. Here, in its post-verdict briefing, Artsana abandons two of its pre-verdict arguments for judgment as a matter of law: (1) Kolcraft failed to establish damages prior to June 3, 2009, Def.'s 50(a) JMOL at 20-21; Def.'s Renewed 50(a) JMOL at 20-21; and (2) the patent is invalid for failing to identify the correct inventors, Def.'s 50(a) JMOL at 23-26; Def.'s Renewed 50(a) JMOL at 23-26.[4]

Because the Court has not yet ruled on Artsana's Rule 50(a) motions, it will address all of the arguments made in those motions, even if they were not specifically renewed in Artsana's Rule 50(b) motion. The Seventh Circuit has expressly "rejected the formalistic renewal requirements for motions for judgment as a matter of law where they serve no purpose." *Holder v. Illinois Dept. of Corrections*, 751 F.3d 486, 492 (7th Cir. 2014). Deeming Artsana's 50(a) arguments to be waived holds no discernible purpose here, especially when "[a] party who knows the court has taken a motion for a verdict under advisement has no reason to be surprised that the motion is still in play." *Id.* at 491.

---

[4]Artsana's initial Rule 50(a) Motion for Judgment as a Matter of Law and its Renewed Rule 50(a) Motion for Judgment as a Matter of Law make identical arguments.

## 1. Infringement of Claim 20

Artsana makes two arguments on Claim 20 of the '993 patent. First, Artsana contends that none of its products fit the limitation "wherein the connectors are pivotably coupled to the mat." Def.'s Rule 50(b) Mot. at 2-5. Artsana asserts that all of its models—PTX-7, PTX-8, PTX-9, and DTX-296—do not have connectors "pivotably coupled" to the mat because the stitching—which connects either the pocket, the plastic ring, or the Velcro attachment to the mat—cannot (in Artsana's view) "rotate, turn, or move around a fixed point," as required by the Court's construction of Claim 20. *Id.* at 4-5.

Artsana made this same argument to the jury (and in summary judgment briefing). The jury rejected it, and the evidence readily supports the verdict. The jury was free to credit testimony from Myers—who is listed as an inventor on the '993 patent—that the "connectors" consisted of, depending on the particular design: (1) the pocket on each corner of the mat and the snap inside; (2) the plastic D-ring on each corner; or (3) the Velcro attachment, all of which secured the four legs to the mat. Trial Tr. at 272:11-273:8. These parts pivot along the stitch seam in each corner, so the jury reasonably found that they fit the definition of "pivotably coupled," that is, the parts rotated, turned, or moved around a fixed point. *Id.* at 273:13-17 ("So if you take this out, you can see there is a stitch line along the fabric here. And basically— I will kind of hold this up so you guys can see it—this piece will rotate back and forth (indicating). So that shows that it's pivotably coupled along that stitch line."). There was nothing inherently "conclusory" about this testimony, as Artsana asserts. *See* Def.'s Rule 50(b) Mot. at 4. Myers simply stated his view on the pivotability of the

connectors on each model, and testified that the stitching was not a "connector," but, rather, a pivot point around which the connectors moved. The jury was free to take Myers' testimony at face value and use that (as well as their common sense) to assess the coupling on the three designs.

Artsana's second argument on Claim 20 likewise fails. Artsana argues its redesigned models, PTX-8 and PTX-9, do not have "at least two legs [that] are pivotably coupled to the hub," because a person is only able to move and rotate the legs around the hub when they are disconnected from the hub. Def.'s Rule 50(b) Mot. at 5-6. Again, though, Myers' testimony presented a factual basis for the jury's verdict, that is, that the legs "rotate to go into that folded position." Trial Tr. at 277:17-18. *See also id.* at 277:20-278:8. He demonstrated to the jurors that all of the models had legs that could be pulled away from the hub—while still connected—and then rotated down into a folded position. If the jury credited his interpretation of the claim's terms, which they were free to do, the products clearly meet the requirements of the claim. Construing the evidence reasonably in Kolcraft's favor, as the Court is obligated to do, this was enough to find that all Artsana's Lullaby models infringed Claim 20.

### 2. Infringement of Claims 28-31

Artsana next offers several arguments for the contention that there was insufficient evidence to find that PTX-8 and PTX-9 infringed Claim 28. First, according to Artsana, PTX-8 and PTX-9 do not meet the requirements of the term "pivoting the leg into a stored position" because the legs on those models do not move around a fixed point. Def.'s Rule 50(b) Mot. at 6-7; Def.'s Rule 50(a) Mot. at 10-11;

Def.'s Renewed Rule 50(a) Mot. at 10-11. Like before, Myers's testimony defeats Artsana's argument. Myers testified that the user will "pull away and then rotate" the legs around the hub into the stored position. Trial Tr. at 282:8-19. To be sure, Myers did not say the literal word "pivot" in that piece of testimony, but he did not have to. The testimony made clear that the legs were rotating around a fixed point— their permanent connection to the hub. *Id.* at 282:10-13 ("So you will see it's actually spring-loaded. So you have to pull it away, because normally it's locked in that open position. So you have to pull away, and then you can (indicating)."). This was enough for the jury to find that PTX-8 and PTX-9 infringed that term of Claim 28.

Second, Artsana argues that no evidence showed that either PTX-8 and PTX-9 include a specific structure in which the legs would rest when the product is stored, and, as a result, the redesigned hubs do not infringe Claim 28. Def.'s Renewed Rule 50(a) Mot. at 12-13. This argument likewise fails because Myers testified that the Artsana hubs had "a pocket for the leg to rest into" and that there was "very much a resting place for that leg in the [Artsana] product." Trial Tr. at 318:11-319:23. Although Myers admitted that the "exact nuances and shapes and details" varied between Kolcraft's product and Artsana's product, that is not nearly the same as conceding that Artsana's products altogether lacked a place to put the legs in the stored position. Indeed, he stated the opposite: the product had a specific position where the legs rested when it was not in use. So it was not unreasonable for the jury to find that the redesigned hubs practiced that limitation of Claim 28.

Finally, Artsana argues that Kolcraft presented insufficient evidence of direct infringement of Claim 28, because there was no evidence Artsana, or someone under its control, performed all the steps of the claimed method. Def.'s Rule 50(b) Mot. at 7 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009)). *See also* Def.'s Rule 50(a) Mot. at 8-9; Def.'s Renewed Rule 50(a) Mot. at 8-9. Artsana also argues that Kolcraft's consumer witness, Tiffany Manzella, did not provide enough support for this claim because she did not own or use PTX-8 or PTX-9, only PTX-7.

Artsana is right about one thing—Manzella was not able to testify about using PTX-8 or the PTX-9. But that is not the end of the story. Circumstantial evidence can be enough to prove direct infringement of a method claim. *See, e.g.*, *Lucent Technologies*, 580 F.3d at 1317-18; *Cascades Computer Innovation, LLC v. Samsung Electronics Co. Ltd.*, 77 F. Supp. 3d 756, 768 (N.D. Ill. 2015); *Bayer Healthcare, LLC v. Zoetis Inc.*, 2016 WL 4179087, *29 (N.D. Ill. Aug. 8, 2016). Here, the jury was free to infer from the evidence that a typical user of PTX-8 or PTX-9 would use the product in the way set forth in Claim 28. For example, Manzella testified that she used PTX-7, which incorporated many of the same functions as the later redesigns, in the exact manner outlined in Claim 28. Trial Tr. at 367:19-368:19. And Artsana's own witness, Mark Messner, testified that Artsana provides instruction manuals, toll-free 800 customer-service numbers, and other information that help end-users use Lullaby products, including in ways that infringe Claim 28. *Id.* at 496:14-497:18.

What's more, Artsana's insistence on direct evidence misapprehends the power of circumstantial evidence. It is only common sense that a customer would take

advantage of all the features offered in a pricey baby product. Put another way, whatever the initial motivation to buy a Lullaby product, once the consumer owns a product that can do all of those useful things—separate the play gym from the bassinet, remove the play gym from the mat, and collapse the play gym—it is common sense that they would take advantage of all those features. At the very least, a jury could reasonably so find. Artsana also half-heartedly argues that a jury could not infer direct infringement of Claim 28 because "there are substantial non-infringing uses for the [Lullaby] Products." Def.'s Rule 50(b) Mot. at 8. *See also* Def.'s Rule 50(a) Mot. at 9. This argument is unpersuasive. Here, the alleged non-infringing uses— using the play yard, bassinet, and changing table without the play gym—were not so dominant that the jury was required to reject the circumstantial evidence of direct infringement. For these reasons, the Court will not disturb the verdict on Claims 28-31.

### 3. Indirect Infringement[5]

Under 35 U.S.C. § 271(b), a party who "actively induces infringement of a patent shall be liable as an infringer." Induced infringement requires knowledge that the inducing conduct amounts to patent infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011). In determining whether a defendant possessed

---

[5]In its Rule 50(a) motions, Artsana refers to Kolcraft's indirect infringement claim as "induced infringement." Def.'s Rule 50(a) Mot. at 9; Def.'s Renewed Rule 50(a) Mot. at 9. It also includes a separate section on contributory infringement, although this argument is sparse and conclusory. Def.'s Rule 50(a) Mot. at 10; Def.'s Renewed Rule 50(a) Mot. at 10. Artsana combines these arguments into one section on indirect infringement in its Rule 50(b) motion. Def.'s Rule 50(b) Mot. at 8. The Court addresses the substance of Artsana's arguments on induced infringement, contributory infringement, and indirect infringement in this section.

that knowledge, again "direct evidence is not required; rather, circumstantial evidence may suffice." *Lucent*, 580 F.3d at 1322 (cleaned up). Artsana offers three objections to the jury's verdict on indirect infringement. First, Artsana asserts that Kolcraft failed to show direct infringement, a necessary element of an indirect infringement claim. Def.'s Rule 50(b) Mot. at 8 (citing *Lucent Techs*, 580 F.3d at 1321-22). The Court has already held that there was sufficient evidence to find direct infringement, so this argument is rejected.

Second, Artsana argues that there was no evidence that it "aided, encouraged, or instructed others to use the [Lullaby] Products in a manner that infringed claims 20 and 28-31 of the '993 Patent." Def.'s Rule 50(b) Mot. at 9. This is directly contradicted by testimony that Artsana provided instruction manuals to consumers and demonstrations to retailers about how to use the Lullaby products. Trial Tr. at 496:14-497:18. Artsana attempts to undermine this evidence by pointing out that "Kolcraft never identified what parts of the instruction manuals aided, instructed, or encouraged consumers to infringe the asserted claims." Def.'s Rule 50(b) Mot. at 9. But that was not necessary. Circumstantial evidence can be enough to prove intent to infringe, and Kolcraft was not required to call a witness to testify about the common-sense use of instruction manuals.

Finally, Artsana argues that Kolcraft failed to present evidence that the Lullaby products "do not have substantial non-infringing uses" and that this defeats the claim as a matter of law. Def.'s Rule 50(b) Mot. at 9 (quoting *Vita-Mix v. Basic Holding*, 581 F.3d 1317, 1328 (Fed. Cir. 2009)). But as the Court already explained,

the non-infringing uses are neither substantial nor integral to the overall product, and thus do not undermine a finding of indirect infringement. *See Fujitsu Ltd. v. Netgear, Inc.*, 620 F.3d 1321, 1330-31 (Fed. Cir. 2010). The jury's verdict on this claim will stand.

### 4. Willful Infringement

Next, Artsana objects to the jury's finding that it willfully infringed the '993 patent. Def.'s Rule 50(b) Mot. at 9-12. "Willful infringement is reserved for only the most egregious behavior such as where the infringement is 'wanton, malicious, [in] bad faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." *Id.* at 9 (quoting *Halo Elecs.*, 136 S. Ct. at 1932). According to Artsana, its behavior did not exhibit willfulness because (1) when it began making the Lullaby product, the patent application was still pending, Def.'s Rule 50(b) Mot. at 10; (2) Artsana believed that Lerado owned the design for the play gym, *id.* at 11; and (3) Artsana's design-arounds were made in good faith, even if they were not successful in avoiding infringement, *id.*

Artsana's first two arguments relate to its original design, PTX-7. Artsana is right that the patent had not issued when it first started selling PTX-7, but the evidence showed that Artsana continued to sell the product even after Kolcraft notified Artsana of the patent and after this lawsuit was filed. Trial Tr. at 169:1-21; 529:5-22. Artsana also declined to present evidence—from attorneys who supposedly rendered non-infringement opinions or from anyone else—substantiating its assertion that it believed PTX-7 was not infringing the patent and that it was acting in good faith. Finally, Artsana's own expert conceded that PTX-7 infringes Claim 28

of the '993 patent. Trial Tr. at 766:13-23. This evidence was enough to find that Artsana willfully infringed the patent via the original design.

Artsana's redesigns present a closer call. Although the jury found that PTX-8 and PTX-9 ultimately still infringed the '993 patent, a redesign undertaken in good faith will not support a finding of willful infringement. *See, e.g.*, *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 745 (Fed. Cir. 1993); *Alloc, Inc. v. Norman D. Lifton Co.*, 653 F. Supp. 2d 469, 476 (S.D.N.Y. 2009). Unfortunately for Artsana, it did not advance any argument that the willfulness finding should have been different as to the different versions of the Lullaby product.[6] Artsana also conceded at trial that it made no changes to the product packaging or marketing literature of the Lullaby product to reflect the redesign. Trial Tr. 495:1-496:13. This tended to undermine the conclusion that the redesigned models were significantly different than the original design. *Id.* at 495:6-9 ("Q. There was no way for an end user to know, if they walked into a store, whether they were buying Plaintiff's Exhibit 7 or 8 and 9, right? A. If they didn't take the unit apart, no.").

### 5. Reasonable Royalty Rate

Artsana next contends that Kolcraft did not meet its burden of proof for establishing reasonable royalty damages, and that the jury's award of what in effect is a 7% royalty rate is not supported by the evidence as a matter of law. Def.'s Rule

---

[6]To be more specific: Artsana declined to argue in the alternative that, even if it willfully infringed the '993 patent with its original design, there was insufficient evidence to find that it did so with the redesigns. The Court might very well have been receptive to this argument because the question of infringement was much closer regarding PTX-8 and PTX-9. The Court cannot supply an argument for a party, though, because doing so would deny the opposing party an opportunity to respond.

50(b) Mot. at 12-20. This argument falls short because Artsana has not shown that, as a matter of law under Rule 50, the jury's verdict is so outrageously high "as to be unsupportable as an estimation of a reasonable royalty." *Rite-Hill Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (en banc) (cleaned up). But this is a very close call.

A patentee is entitled to a reasonable royalty on the infringer's sales, but the reasonable royalty is "merely the floor below which damages shall not fall." *Lucent Techs.*, 580 F.3d at 1324 (cleaned up); *see also Rite-Hite Corp..*, 56 F.3d at 1544 ("[T]he language of the statute is expansive, rather than limiting. It affirmatively states that damages must be adequate, while providing only a lower limit and no other limitation."). The jury need not accept the reasonable royalty rate presented by either party but can instead decide for itself what is a reasonable royalty based on the evidence submitted. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991). That said, the jury's award must be reasonably supported by evidence in the record. *Unisplay v. American Elec. Sign*, 69 F.3d 512, 517 (Fed. Cir. 1995).

Here, both sides presented reasonable royalty rates below the 7% that the jury eventually awarded. Artsana's expert, Michael Chapman, opined that a "reasonable royalty rate shouldn't be any higher than 2 percent of net sales." Trial Tr. at 870:19-20. Kolcraft's expert, Frank Bernatowicz estimated that a reasonable royalty rate was 5.8%. *Id.* at 578:21-24. Despite the gap between these estimates and the final verdict, evidence presented to the jury supported their award. Bernatowicz provided

testimony that supports the jury's decision to go above his estimate reasonable royalty rate, at least when the evidence is viewed in a light most favorable to Kolcraft under Rule 50 (it is a different standard and story under Rule 59, as explained later).

First, Bernatowicz emphasized that his 5.8% estimation was, in his opinion, the *minimum* acceptable royalty rate needed to properly compensate Kolcraft. *See* Trial Tr. at 579:2-14. Second, Berntowicz calculated his rate, in part, by looking at a license agreement for the '993 patent between Artsana and Graco, which applied a 5% royalty rate. Berntowicz explained to the jury that he believed the 5% royalty rate applied in that license was "conservative," because it was negotiated as part of a settlement agreement between two parties engaged in active litigation. *Id.* at 546:22-549:10 ("So as I developed this baseline royalty rate, I looked for the best licensing evidence, found it in the '993 Graco license, realizing that it was conservative and likely less than full value.").

Finally, to formulate his opinion, Bernatowicz conducted an analysis of the well-known *Georgia-Pacific* factors. Trial Tr. at 545:12-557:19, 563:16-579:1; *see also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Factors 12 and 13 in the *Georgia-Pacific* analysis are (12) the part of the profit or selling price that is customary to allow for the use of the invention; and (13) the part of the realizable corresponding profit that should be credited to the invention. *Id.* Bernatowicz analyzed these factors together and found that, based on that analysis alone, the reasonable royalty rate was 7.7%. Trial Tr. at 577:22-578:1. This analysis could have served as a basis for the jury's award, even though it exceeded

Bernatowicz's final estimation of a reasonable royalty, when combined with the other evidence that the 5.8% rate was conservative (because the Graco license was conservative). In *Powell v. Home Depot U.S.A., Inc.*, the jury awarded the plaintiff a royalty of $7,736 per unit sold, even though the plaintiff's expert testified that a reasonable royalty would be no more than $7,000 per unit. 663 F.3d 1221, 1239-41 (Fed. Cir. 2011). Nonetheless, the Federal Circuit upheld the denial of judgment as a matter of law sought by the infringer, because the same expert "testified that the scope of possible reasonable royalties was bounded by a range of $2,180 per unit up to approximately $8,500 per unit." *Id.* at 1241. Given Bernatowicz's analysis and opinion to the effect that the 5.8% rate was conservative, combined with Rule 50's deferential standard, the jury's chosen royalty rate is supported by a legally sufficient evidentiary basis.

### 6. Graco License

Artsana objects to the damages award on the related but separate ground that Kolcraft failed to show that the Graco license—relied on by Bernatowicz for his royalty estimate—was a comparable license to the hypothetical negotiation between Artsana and Kolcraft. Def.'s Rule 50(b) Mot. at 14-20.[7] Artsana alleges that Bernatowicz failed to account for four unique characteristics of the Graco license that make it too different from the hypothetical license between Artsana and Kolcraft: (1) the Graco license resulted from litigation, *id.* at 16-17; (2) it is not clear whether the Graco license considered the apportionment between patented and non-patented

---

[7]Artsana did not make this argument in its Rule 50(a) motions. Because Kolcraft did not object to this argument as forfeited, though, the Court will proceed to the merits.

features, *id.* at 17-18; (3) the Graco license includes additional intellectual property outside of the intellectual property Artsana would have licensed, *id.* at 18; and (4) the Graco license pre-cleared multiple products from future infringement, *id.* at 19.

It is true that these characteristics of the Graco license provide Artsana with ammunition against the license's probative force in the hypothetical negotiation between Kolcraft and Artsana. But the differences are not so strong that they render the jury's damage award unreasonable or unsubstantiated as a matter of law. Indeed, weighing the other way, there are similarities between the Graco license and the hypothetical license between Kolcraft and Artsana. Both deal primarily with the same intellectual property (the '993 patent), arise from the same lawsuit, involve the same primary negotiator (Kolcraft CEO Koltun), and involve competitors in the same industry making similar products. Bernatowicz told the jury that it was rare to find a comparable license that involved the *exact* same patent and products as the hypothetical license. Trial Tr. at 463:13-22. Artsana's expert, although stopping short of condoning the 5% baseline rate, conceded that the Grace license was "comparable enough to merit further consideration." *Id.* at 854:13-15. So the jury was free to find that the similarities overcame the differences between the two licenses, making the comparison between the two acceptable. *Virnetx, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) ("[W]e have never required identity of circumstances; on the contrary, we have long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty.") (cleaned up).

Artsana also overstates Bernatowicz's failure to account for the differences between the licenses in his analysis. Bernatowicz actually did discuss the impact of the litigation posture on the outcome of the Graco license. Trial Tr. at 546:22-549:10. He came to a different conclusion about the impact of such a posture than Artsana—which argues that Graco may have paid a premium to settle litigation quickly—and the jury could reasonably accept his opinion. Bernatowicz also testified that he spoke with Koltun about Koltun's rationale for awarding the license to Graco for a 5% royalty rate. *Id.* at 550:17-551:2. Although Bernatowicz did not elaborate on the exact information he exchanged with Koltun, the jury was free to infer from this fact that Bernatowicz researched the basis for using the Graco license as a comparison. And the jury heard the pluses and minuses of the Graco license as a comparator. Artsana elucidated all the differences during its cross-examination of Bernatowicz. *Id.* at 586:15-591:14, 594:12-599:6, 602:16-609:19, 611:14-614:21. In light of the record evidence, this was enough to support the use of the Graco license as a comparable license in the royalty rate analysis. *See Virnetx, Inc.*, 767 F.3d at 1330 ("[A]ll of the other differences that Apple complains of were presented to the jury, allowing the jury to fully evaluate the relevance of the licenses... No more is required in these circumstances.").

### 7. *Georgia-Pacific* Factors

Artsana next argues that Bernatowicz's analysis of the *Georgia-Pacific* factors did not justify increasing the reasonably royalty rate from 5% to 5.8%. Def.'s Rule

50(b) Mot. at 20-23.[8] Artsana takes issue with Bernatowicz's analysis of four of the *Georgia-Pacific* factors—5, 12, 13, and 14. Factor 5 is the "commercial relationship between the licensor and the licensee, such as[] whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor." *Georgia-Pacific Corp.*, 318 F. Supp. at 1120. Artsana alleges that Bernatowicz did not properly consider this factor because he did not elaborate on how the commercial relationship between Kolcraft and Graco may have differed from the commercial relationship between Kolcraft and Artsana. Def.'s Rule 50(b) Mot. at 20-21. But that comparison is not necessarily required under *Georgia-Pacific*, and, indeed, Artsana cites no case law to support this argument. *See* Def.'s Rule 50(b) Mot. at 20-21. Instead, it was enough that Bernatowicz detailed the competitive relationship between Artsana and Kolcraft as part of his analysis. Trial Tr. at 555:24-556:24. And if Artsana was so concerned about this alleged shortcoming in Bernatowicz's analysis, then they should have brought it up during his cross-examination. Their failure to do so is no reason to throw out the jury's damages award.

Artsana next objects to Bernatowicz's analysis of *Georgia-Pacific* Factors 12 and 13, which (to repeat) instruct consideration of (12) the portion of the profit or selling price that is customary to allow for the use of the invention; and (13) the portion of the realizable corresponding profit that should be credited to the invention.

---

[8]Like its other arguments on damages, Artsana failed to make this argument in its Rule 50(a) motions, but the Court will, nonetheless, consider it because Kolcraft failed to object.

Artsana asserts that Bernatowicz's analysis was fundamentally flawed because it relied on his estimation that one-third of the incremental profit of Artsana's product should be attributed to the patented features. Def.'s Rule 50(b) Mot. at 21-23. Artsana takes issue with this estimate because the Court prohibited Bernatowicz from relying on that same apportionment calculation to determine the *baseline* royalty rate in his analysis. R. 343, Pre-Pretrial Conference Order at 5. The Court explained that "[a]lthough Bernatowicz discusses the value added by the patented features in abstract terms… he does not explain how those advantages translate to the one-third apportionment number he chose." *Id.* So the Court specifically excluded testimony "about the one-third apportionment figure, or any conclusions flowing from that figure." *Id.*

After excluding that evidence, the Court invited both sides to file position papers on the issue. Pre-Pretrial Conference Order at 6. Along with its position paper, Kolcraft filed an amended report from Bernatowicz that included an entirely different methodology for calculating the baseline royalty rate. R. 347.2, Bernatowicz Supp. Report at 8-9. In a separately filed declaration, Bernatowicz also provided additional justification and evidence for his use of the 33% apportionment rate. R. 347.5, Bernatowicz Dec. at 1-2. The Court decided it would allow the filing of the supplemental report, but also gave Artsana another opportunity to depose Bernatowicz on his new report and declaration. R. 349, Bernatowicz Order at 3.

At trial, Artsana asserted that Bernatowicz continued to rely on the 33% apportionment rate in his supplemental report and sought to impeach him with this

fact on cross-examination. Trial Tr. at 345:12-19. The Court determined that Artsana could ask Bernatowicz (1) if he "authored a first report, in which he decided to apportion one-third of the incremental profit to the patented features," and (2) "isn't it true the Court entered an order that excluded the first report because the report did not adequately explain how the patented features result in a one-third apportionment." *Id.* at 350:8-20. When Bernatowicz testified about his estimation of the baseline royalty rate on direct examination, he did not mention the 33% apportionment rate. *Id.* at 541:18-543:20, 544:25-551:2. But, when he got to *Georgia-Pacific* Factors 12 and 13, he began to discuss the analysis he laid out in his declaration that supported the 33% apportionment figure. *Id.* at 557:5-18.

Artsana objected to this testimony because the declaration was not part of Bernatowicz's expert report and his analysis of Factors 12 and 13 relied on the excluded 33%-apportionment figure. Trial Tr. at 557:24-558:4. At a sidebar conference, the Court explained that the objection presented a "close call," because Kolcraft seemed to be sneaking in the apportionment through the back door. *Id.* at 558:22-559:14. Ultimately, however, the Court overruled the objection and allowed Bernatowicz to testify about the apportionment figure in the context of the *Georgia-Pacific* factors because: (1) Artsana was on sufficient notice that Bernatowicz might testify about the apportionment number, as it was referenced in the supplemental report and explained in his declaration; (2) Artsana failed to question Bernatowicz on the apportionment number at his deposition; and (3) the apportionment number was properly relied on in relation to the *Georgia-Pacific* factors because less detail is

required in that analysis in comparison to the determination of the baseline royalty rate. *Id.* at 562:18-563:7.

These justifications still hold post-verdict. Bernatowicz's supplemental report and declaration made clear that, with the additional support he provided, he would try to testify on the apportionment rate, even after the exclusion of his first report. It was up to Artsana to question Bernatowicz about his analysis and estimation of the 33% number at his deposition. Although this still presents a close call, the apportionment number was appropriately used in Bernatowicz's *Georgia-Pacific* analysis, because those fifteen factors are all applied to the underlying premise of the baseline royalty rate. Moreover, Artsana highlighted the flaws in Bernatowicz's apportionment estimation—and his overall damages calculation—on cross-examination. Trial Tr. at 615:13-621:8. In sum, Bernatowicz's apportionment figure was properly presented to the jury as part of his *Georgia-Pacific* analysis, and the jury was free to credit it.

### 8. Damages on Method Claims 28-31

Artsana asserts that the damages award must be overturned because Kolcraft presented no evidence to "quantify the extent to which the accused method [in claims 28-31] is actually practiced by users of the Artsana Products." Def.'s Rule 50(b) Mot. at 23. Like Artsana's other arguments on Claims 28-31, this overstates Kolcraft's evidentiary burden. There is no requirement "that damages in all circumstances be limited to specific instances of infringement proven with direct evidence." *Lucent*, 580 F.3d 1334. Here, Kolcraft presented direct evidence that the original design was used in a way that infringed Claims 28-31. Trial Tr. at 367:19-368:19. The jury was free to

infer from this evidence and their own common sense about the product that it was used this way by pretty much every other consumer. As the Court explained in its summary judgment opinion, "the appeal of the accused products is their ability to practice the methods described in Claims 28-31." R. 338, Summary Judgment Op. at 14-15. This was a sufficient basis for the jury to award damages on Claims 28-31.

## 9. Damages Prior to June 3, 2009

In its Rule 50(a) motions, Artsana argued that Kolcraft could not establish damages before June 3, 2009—the date the Complaint was filed—because that was the earliest they had actual notice of the '993 patent. Def.'s Rule 50(a) Mot. at 20; Def.'s Renewed 50(a) Mot. at 20. Artsana abandoned this argument in its post-verdict motion, likely because Kolcraft presented evidence that Koltun told Mansker about the patent at least a few months before the Complaint was filed, and the jury must have found that to be true. That evidence was enough to establish damages prior to the date of the Complaint.

## 10. Inventorship

Artsana's final argument in its Rule 50(a) motions was that the '993 patent failed to identify the correct inventors. Def.'s Rule 50(a) Mot. at 23; Def.'s Renewed 50(a) Mot. at 23. This argument was likewise abandoned in Artsana's Rule 50(b) motion. In any event, Artsana faces an uphill battle in challenging inventorship, and "must meet the heavy burden of proving its case by clear and convincing evidence." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004). Artsana has not met that burden. It fails to cite to any exhibits or portions of the record to support its argument. Without more, the jury's verdict will not be disturbed.

## B. Defendant's Rule 59 Motion

Along with its Rule 50 motions, Artsana moved for a new trial under Rule 59. Def.'s Mot. New Trial. Artsana asserts several arguments in support of this motion.

### 1. Jury Verdict

Artsana first argues that a new trial is warranted because the verdict is against the manifest weight of the evidence. Def.'s Mot. New Trial at 2. In support, Artsana refers back to its Rule 50(b) motion. *Id.* at n. 2. Artsana also points out that, in assessing a new-trial motion, the Court may consider the credibility of the witnesses and the strength of the facts put forth at trial (in contrast to a Rule 50 motion for judgment as a matter of law). *Id.* at 2 (*citing Mejia*, 650 F.3d at 634). To the extent this argument is even preserved in light of its sparse presentation, there is nothing about the credibility of the witnesses or strength of the evidence that leads to a different outcome than Artsana's Rule 50 motion.

### 2. Bernatowicz's Supplemental Report and Testimony

Artsana next objects to the allowance of Bernatowicz's supplemental expert report and his trial testimony. Def.'s Mot. New Trial at 3-7. Like many of its objections, Artsana has divided this one into two parts.

First, Artsana asserts that, under Federal Rule of Civil Procedure 16(b), Kolcraft was required to show "good cause" to submit the supplemental report, which Kolcraft allegedy failed to do. Def.'s Mot. New Trial at 4 (citing Fed. R. Civ. P. 16(b)(4)). But the admission of a late expert disclosure is governed by Federal Rule of Civil Procedure 37, not Rule 16. *See Karum Holdings LLC v. Lowe's Companies Incorporated*, 895 F.3d 944, 951-52 (7th Cir. 2018) (affirming application of Rule

37(c)(1) to exclude delayed expert disclosure). There is no good cause requirement under Rule 37(c)(1). Rather, the "exclusion of non-disclosed [expert] evidence is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless." *Id.* at 951. So, the Court applied the governing standard in Rule 37(c)(1) and minimized any prejudice from the late disclosure, including ordering Kolcraft to bear deposition costs. Bernatowicz Order at 3. The Court also pushed back the trial schedule to give Artsana time to review the new report, file a response, and depose Bernatowicz. *Id.* Although the timing was still tight, there was very little information or analysis in the supplemental report that was brand new to Artsana or its expert. As a result, the admission of the supplemental report was authorized.[9]

Second, Artsana argues that the supplemental report and Bernatowicz's testimony failed to establish the Graco license as comparable and was, thus, improperly admitted at trial. Def.'s Mot. New Trial at 6-7. As already discussed, the jury was free to find that any differences between the Graco license and the hypothetical license between Kolcraft and Artsana were outweighed by the similarities between the two—including that the two involved the same patent, the

---

[9]Artsana objects to the admission of Bernatowicz's supplemental report on the separate but related ground that the supplement violated Local Patent Rule 5.3, which requires a showing of "good cause that the amendment or supplementation could not reasonably have been made earlier." Mot. for New Trial at 4 (*quoting* LPR 5.3). "Local patent rules are essentially a series of case management orders that fall within a district court's broad power to control its docket and enforce its order." *Keranos, LLC v. Silicon Storage Tech., Inc.*, 797 F.3d 1025, 1035 (Fed. Cir. 2015). The Court has broad discretion to enforce the Local Patent Rules. *Oil-Dri Corp. of America v. Nestle Purina PetCare Co.*, 2018 WL 3130943, at *4 (N.D. Ill. June 26, 2018) (citing *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1329 (Fed. Cir. 2013)). As a result, and because the admission of the supplemental report was proper under the Federal Rules of Civil Procedure, the Court upholds its prior decision.

same licensor, and the same individual negotiator for Kolcraft. The introduction of the Graco license does not warrant a new trial.

### 3. *Georgia-Pacific* Factors 12 and 13

Artsana's third argument for a new trial is that Bernatowicz should not have been allowed to rely on his 33% apportionment figure when analyzing *Georgia-Pacific* factors 12 and 13. Def.'s Mot. for New Trial at 7-8. Although Artsana made multiple objections to this testimony, and it was not an obvious call from the Court's perspective, the admission of the testimony was not so unfair as to warrant a new trial. As previously discussed, Artsana was on notice that Kolcraft might seek to admit Bernatowicz's apportionment estimation based on his supplemental report and declaration. Artsana also had the chance to depose Bernatowicz about that figure. The apportionment estimation was also properly used in the *Georgia-Pacific* analysis, even though it was not sufficient to support Bernatowicz's initial *baseline* royalty estimate, because less detail is required when applying the *Georgia-Pacific* factors. Finally, Artsana had the opportunity to expose any flaws in the apportionment analysis at trial during its cross-examination of Bernatowicz and its direct examination of Chapman. This contention too does not support a new trial.

### 4. Mansker's Phone Call

At trial, the Court allowed Koltun, Kolcraft's President and CEO, to testify about a phone call that he made to Mansker, Artsana's CEO, about the '993 patent, as well as an alleged return phone call Mansker made to Koltun. Trial Tr. at 162:3-166:20. Artsana objects to the admission of this evidence because Kolcraft allegedly failed to properly notify Artsana about this return phone call in its answers to

interrogatories. Def.'s Mot. New Trial at 8-9. This argument fails to move the needle for Artsana. First, as the Court articulated at trial, Kolcraft did not commit any discovery violation. Trial Tr. at 164:24-165:24. Artsana was unable to point to an interrogatory it served that would have covered Mansker's call to Koltun, meaning the Court was not able to conclude that Kolcraft had committed a discovery violation. *Id.* at 165:18-24. Artsana also could not say for sure whether this call came up at Koltun's deposition. *Id.* at 166:7-14. So there was no record evidence that Koltun denied receiving a return phone call from Mansker or even gave an evasive answer on the topic.[10] As the Court pointed out at the time, Artsana should have requested to reopen Koltun's deposition to explore the substance of Mansker's phone call. *Id.* at 166:15-20. Without establishing a discovery violation, the evidence was properly allowed at trial.

### 5. Evidence of Unasserted Claims

Artsana asserts that it is entitled to a new trial because the Court precluded reference to the unasserted claims of the '993 Patent, and particularly the PTO's reexamination of those claims. Def.'s Mot. New Trial at 9-11. Kolcraft initially asserted these claims against Artsana in its first complaint, and Artsana's reexamination resulted in amendments to all of them. *Id.* at 9. Evidence of this,

---

[10] If anything, the evidence in the record seems to show that Kolcraft properly disclosed the communication between Koltun and Mansker. In Kolcraft's Response to Artsana's Third Set of Interrogatories, it stated that "Artsana was put on notice of its infringement of the '993 patent at least as early as May 2009 through a communication between Tom Kulton and Greg Mansker, during which Mr. Koltun informed Mr. Mansker about the '993 patent and Artsana's infringement." DTX-313, Kolcraft's Resp. to 3d Rogs, ¶ 20. That being said, Kolcraft failed to cite to this in their response to Artsana's motion for a new trial, so the Court will not base its decision on this interrogatory answer.

according to Artsana, was relevant to Kolcraft's claim for willful infringement because it tends to undermine Kolcraft's argument that the reexamination was a litigation tactic used to delay the lawsuit. *Id.* at 9-10.

As the Court explained in its prior decisions, "Artsana's good-faith belief that it was not infringing *other* claims is not relevant to whether Artsana willfully infringed the *asserted* claims." Pre-Pretrial Conference Order at 3. To make that type of argument would violate Federal Rule of Evidence 404(a). The evidence was also properly excluded for the independent reason that it presented a problem under Federal Rule of Evidence 403. Any probative value was vastly outweighed by the potential for undue delay and jury confusion—especially in an already complex patent trial—because to truly evaluate the proposed evidence, the jury would have to hear a lot more about the other claims.[11]

### 6. References to Travelin' Tot Product as the "Patented Product"

Next, Artsana argues that Kolcraft's references to the Travelin' Tot product as the "patented product" were confusing to the jury and warrant a new trial. Def.'s Mot. New Trial at 11-12. Artsana admits that Kolcraft made only three references to the "patented product" throughout the trial. R. 457, Def.'s Reply Mot. New Trial at 7 (citing Trial Tr. at 191:21-24, 293:11-13, 773:25-774:4). This is not enough to be

---

[11] Artsana also argues that Kolcraft's patent expert, Nicholas Godici, should not have been allowed to testify that "'substantially all' of the prior art relied on in Artsana's contentions were already rejected by the PTO and the claims were patentable." Def.'s Mot. New Trial at 11. It is not clear that Godici ever made that point. Instead, when referencing the original patent, he explained that the list of prior art presented at trial amounted to "all U.S. patents that were under consideration by the examiner during the examination of the '993." Trial Tr. at 415:23-25. But, regardless, Artsana did not object to this specific testimony at trial, so the argument is forfeited.

prejudicial to Artsana. The term itself is hardly prejudicial, as it is clearly shorthand for a product that was *eventually* patented, albeit after Artsana produced its first Lullaby product. What's more, both parties went to great lengths to clarify the actual issuance date of the patent. Nor was it prejudicial to allow Kolcraft to show the Travelin' Tot product during its opening statement. As the Court explained to Artsana at the time, demonstratives used in opening arguments are "not evidence," and, by using it, Kolcraft was "taking the risk" that it would not be allowed in later on. Trial Tr. at 96:25-97:4. Neither of these evidentiary decisions warrant a new trial.

### 7. Jury Instruction on Willful Infringement

Artsana further argues that a new trial must be awarded because the Court improperly instructed the jury on willful infringement. Def.'s Mot. New Trial at 13-15. The Court must look to Federal Circuit law to determine if a jury instruction on an issue of patent law is erroneous. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004). "[A] jury verdict will be set aside, based on erroneous jury instructions, if the party seeking to set aside the verdict can establish that those instructions were legally erroneous, and that the errors had prejudicial effect." *Bettcher Industries v. Bunzl USA, Inc.*, 661 F.3d 629, 641 (Fed. Cir. 2011) (cleaned up). Prejudicial error occurs when it is "inconsistent with substantial justice." *Id.* at 641-42 (cleaned up). Even where an error has occurred, though, if the error is harmless or was cured by another instruction, "a new trial would be mere waste and affirmance of the judgment is required." *Id.* at 642 (cleaned up).

Artsana's argument here is unpersuasive because it has not explained why the willfulness instruction was legally flawed. Artsana takes issue with the Court's

decision to modify the American Intellectual Property Law Association's model instruction on willful infringement in the following ways: (1) adding the words "but need not" in the following phrase "Some of the circumstances you may, but need not, consider include;" (2) removing the phrase "malicious, wanton, deliberate, consciously wrongful, flagrant, or in bad faith" as a factor for the jury to consider; and (3) adding the phrase "whether or not defendant intentionally copied a product or a method of plaintiff's that is covered by the '993 patent" as a factor for the jury to consider. Def.'s Reply Mot. New Trial at 9-10. But none of these changes are contrary to Federal Circuit law, nor did they present a risk of juror confusion.

First, the addition of "but need not" to the term "may" barely changes the meaning of the term "may" in the first place. And it certainly does not signal that the jury need not consider the totality of the circumstances, because it was specifically instructed to do so. Trial Tr. at 947:6-9. The point of "but need not" is to ensure the jury understands that it is up to them to decide whether the particular circumstance even *existed*, as well as to the decide the strength of the probative force. Second, removing the phrase "malicious, wanton, deliberate, consciously wrongful, flagrant, or in bad faith" did not modify the overall meaning of the instruction. The jury was still instructed that the plaintiff needed to "intentionally infringe" the patent, and that it could not find willfulness "merely because the defendant knew about the patent without more." *Id.* at 946:23-947:3. In other words, contrary to Artsana's argument, the jury knew how to "determin[e] what type of knowing infringement rises to the level of willfulness." Def.'s Reply Mot. New Trial at 10. Nor does the

instruction conflict with the holding in *Halo*. There, the Supreme Court explained that enhanced damages are warranted when the defendant's conduct is "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant or—indeed— characteristic of a pirate." *Halo Electronics, Inc.*, 136 S.Ct. at 1932. The Court's willfulness instruction at the beginning of the trial makes clear that the jury needed to find Artsana's conduct "consciously wrongful" or "deliberate." Trial Tr. at 110:25-111:4. And the final instruction reiterated that the infringement needed to be intentional. *Id*. at 947:4-5. As previously explained in deciding what instructions to give, the Court removed unnecessarily duplicative and vague terms from what would have been a string of adjectives. As *Halo*'s reference to a "pirate" colorfully demonstrates, trial courts are not required to explain legal concepts to non-lawyer jurors via the verbatim words from Federal Circuit or Supreme Court opinions that are intended to describe concepts for the bench and the bar (unless, of course, the higher courts are specifically and expressly providing the wording of jury instructions, an occasion that trial courts always cheer).

Finally, instructing the jury to consider "whether or not defendant intentionally copied a product or a method of plaintiff's that is covered by the '993 patent" actually reinforces the standard articulated in *Halo*, which is that willfulness requires something more than mere knowledge of the patent. No new trial is warranted for any instructional error.

## 8. Claim Construction

Artsana's next argument is that the Court "rendered erroneous claim constructions that prejudiced Artsana's case on infringement, invalidity, or both."

41

Def.'s Mot. New Trial at 15-18. Artsana's briefing on this argument amounts to little more than a motion to reconsider the Court's prior claim construction opinions. 9/2/16 Claim Const. Order; R. 285. 4/13/18 Claim Const. Order. In those opinions, the Court considered and rejected Artsana's alternative constructions. Artsana now cites to its previous briefing on the issue, but absent anything new, the Court will not reconsider its previous constructions.

To be sure, Artsana argues that the trial testimony demonstrates that the constructions were erroneous. Def.'s Mot. New Trial at 16. But Artsana only cites to testimony from its own expert, who restated the same argument Artsana made at the claim-construction stage. *Id.* at 17 (citing Drobinski's testimony that Claim 20 failed to describe the device in any detail, and the use of the term "connectors" rendered the claim indefinite). And Kolcraft managed to undermine this testimony on cross-examination by pointing out that Drobinski's opinion put him at odds with four patent examiners and three administrative law judges in the Patent Office. Trial Tr. at 774:11-775:9. The jury was free to discredit Drobinski's testimony.

### 9. Damages

Artsana's final argument for a new trial is that the jury's damages award was excessive and not sufficiently supported by the evidence presented at trial. Def.'s Mot. New Trial at 19-21. If the Court declines to award a new trial, then Artsana alternatively advocates for a remittitur of the award. *Id.* at 22. The Court may vacate a jury's damages award only if it is "against the clear or great weight of the evidence." *Unisplay*, 69 F.3d at 517. But "any rate determined by the trier of fact must be supported by relevant evidence in the record." *Id.* By statute, a patentee whose patent

has been infringed is entitled to damages "adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with the interest and costs as fixed by the court." 35 U.S.C. § 284. It was Kolcraft's burden to prove damages by a preponderance of the evidence. *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1029 (Fed. Cir. 1996).

This is a very close question. Unlike when deciding the Rule 50 motion, the Court defers less to the jury in assessing the new-trial motion, and is permitted to weigh the comparative strength of the evidence. Here, as already detailed at length, Kolcraft sought damages based on a reasonable royalty rate and presented evidence of the factors set out in *Georgia-Pacific Corp.* as support for its estimation. The elephant in the room is that the jury awarded damages at a rate of 7.7%, which is *higher* than the 5.8% proposed by Bernatowicz and Kolcraft's counsel during closing arguments. It would go without saying that a jury does not typically give *more* money than what the plaintiff asks for. At the end of the day, however, the Court cannot say that the 7.7% rate is against the manifest weight of the evidence.

First, as noted earlier, it is not as if the jury picked 7.7% out of thin air: this is the rate resulting from Bernatowicz's analysis of *Georgia-Pacific* Factors 12 and 13, namely, (12) the part of the profit or selling price that is customary to allow for the use of the invention; and (13) the part of the realizable corresponding profit that should be credited to the invention. Trial Tr. at 577:22-578:1. The jury also could rely on Bernatowicz's opinion that the 5.8% rate was the "minimum amount of damages" that would compensate Kolcraft. *Id.* at 579:2-14. This opinion sprung from

Bernatowicz's explanation that the Graco license (which was a 5% royalty rate) was "conservative," because it was negotiated as part of a settlement agreement between two parties engaged in active litigation. *Id.* at 546:22-549:10 ("So as I developed this baseline royalty rate, I looked for the best licensing evidence, found it in the '993 Graco license, realizing that it was conservative and likely less than full value."). Put another way, it was not manifestly wrong for the jury to conclude that the rate should be north of 5.8%, and with that premise in place, then rely on the 7.7% analysis of Factors 12 and 13. After all, Kolcraft's creativity in designing a play gym that was easy to transport and to store could readily be viewed by the jury as a key innovation that differentiated the patent from other products, which is what Factors 12 and 13 are getting at. Ultimately, though the question is close, the Court affirms the jury's damages award.

### C. Motion for Permanent Injunction

With the verdict intact, it is time to turn to Kolcraft's motions. Kolcraft first moves for a permanent injunction under Federal Rule of Civil Procedure 65. R. 438, Pl.'s PI Mot. Kolcraft argues that Artsana must be enjoined from "making, using, selling, offering to sell, distributing, importing, advertising, and/or promoting" the Lullaby products within the United States because Artsana has disregarded the jury verdict to date. *Id.* at 1, 34. Federal courts have long required a plaintiff seeking a permanent injunction to show four things: (1) the plaintiff has suffered an irreparable injury; (2) remedies available at law, like monetary damages, are inadequate to compensate for the injury; (3) considering the balance of hardships between the

plaintiff and defendant, a remedy in equity is warranted; and (4) a permanent injunction is in the public's best interest. *eBay*, 547 U.S. at 391.

### 1. Irreparable Injury and Remedies Available at Law

Beginning with the first and second elements—irreparable harm and inadequacy of money damages—Kolcraft argues that it is not enough that Artsana alleges that it has stopped selling Lullaby products. Pl.'s PI Mot. at 2-3. Kolcraft instead contends that it is sure to suffer irreparable harm unless there is persuasive evidence that further infringement will not take place. *Id.* at 2 (quoting *Black & Decker v. Robert Bosch Tool Corp.*, 2006 WL 3446144, at *3 (N.D. Ill. Nov. 29, 2006)). Kolcraft further asserts that there is evidence that infringement is still currently happening. Pl.'s PI Mot. at 3. CEO Koltun testified at trial that he was able to find Lullaby products sold on some e-commerce websites, Trial Tr. at 178:1-9, and Kolcraft asserts that Artsana continued to provide instruction manuals for the Lullaby products on its website, Pl.'s PI Mot. at 3.

On the last point, the Court was unable to find manuals for the infringing products on the websites for either Artsana or Chicco, but the fact that the accused Lullaby products were sold on e-commerce websites after Artsana ceased making them is relevant. Artsana has also not presented any evidence that it is incapable of again producing the Lullaby products. There is no indication that it lacks the capacity or the capital to produce them or renter the market. This is enough to show that there is a risk of future infringement. *See W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1282 (Fed. Cir. 1988), abrogated on other grounds as recognized in *Zoltek Corp. v. U.S.*, 672 F.3d 1309 (Fed. Cir. 2012); *Black & Decker*, 2006 WL 3446144, at *4.

In addition, Kolcraft and Artsana are competitors in the same market. Artsana's argument that the two cannot be considered competitors because their two respective products were sold at different price points is not convincing. It is still likely that Kolcraft lost market share to Artsana when the first Lullaby product was introduced. *Mytee Products, Inc. v. Harris Research, Inc.*, 439 Fed. App'x 882, 887 (Fed. Cir. 2011) (non-precedential disposition) ("In this case, the district court rationally concluded that Harris had shown irreparable harm based on its finding that Mytee and Harris were indirectly competing through their customers."). The addition of another very similar product to the market may have also confused customers or altered Kolcraft's brand reputation, even if just for the few years that both products were sold. "[L]oss of market share, brand recognition, and customer goodwill … may frequently defy attempts at valuation, particularly when the infringing acts significantly change the relevant market." *i4i Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010).

Finally, Kolcraft's license agreement with Graco does not preclude a permanent injunction here. "While the fact that a patentee has previously chosen to license the patent may indicate that a reasonable royalty does compensate for an infringement, that is but one factor for the district court to consider." *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008). A reasonable royalty is sufficient to compensate Kolcraft for Artsana's past infringement. But there is no adequate remedy at law for Artsana's potential future infringement.

## 2. Balance of Hardships

Both parties argue that the balance of hardships tips in its favor, but Kolcraft has the better argument. Artsana's witness, Messner, testified at trial that the company has stopped selling the infringing products and moved away from play yards with toy gyms altogether. Trial Tr. at 523:10-525:22. He specifically stated that Artsana's newest model of the its toy gym, the Lullaby Magic Playard, was designed to be a "refresh" and was selling quite well. *Id.* at 524:17-525:17. This significantly undermines Artsana's argument that it will be burdened by a permanent injunction. It clearly no longer relies on sales of the infringing product and is not at risk of going out of business or even losing any nominal amount of money from sales as a result of the injunction. This is enough to tip the scales in favor of Kolcraft. *See Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013); *Black & Decker*, 2006 WL 3446144, at *5.

## 3. Public Interest

The final factor is whether the permanent injunction would be in the best interest of the public. The Federal Circuit has long held that public policy favors the enforcement of patent rights. *See Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006); *PPG Indus., Inc. v. Guardian Indus., Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996). This again favors issuing a permanent injunction. But it is worth noting that there are times when an injunction may be contrary to health or safety concerns, and thus undermine the public interest. That is the case for one aspect of Kolcraft's requested injunction: that the Court enjoin Artsana from providing instruction manuals for the discontinued infringing products on its website. As

already mentioned, the Court was unable to find these on Artsana's current website. But if Artsana decides to make them accessible, whether online or in response to a consumer's request, providing the manual would *serve* the public interest: the manuals provide numerous warnings and safety information. Trial Tr. at 515:10-519:3. For this reason, Artsana should not be enjoined from posting manuals online or otherwise providing them to the public.

In sum, Kolcraft has demonstrated that it will suffer an irreparable injury without an injunction, the available remedies at law are inadequate, the balance of hardships weighs in its favor, and an injunction will serve the public interest (with the exception on the manuals discussed above). The Court thus permanently enjoins Artsana from making, using, selling, offering to sell, distributing, importing, advertising, or promoting the infringing products, represented by PTX-7, PTX-8, PTX-9, and DTX-296. But Artsana remains free to continue to provide instruction manuals for those products.

### D. Motion for Prejudgment Interest

Kolcraft argues that an award of prejudgment interest is necessary to make it whole. Pl.'s Mot. Prejudgment Int. at 1 (quoting *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 (1983)). Awarding prejudgment interest is the default in patent cases. *Crystal Semiconductor Corp.*, 246 F.3d at 1361 (describing prejudgment interest as the rule, not the exception). But the Court may decline to award it in certain circumstances, including when the patentee unduly delays prosecuting the infringement. *Id.* Artsana argues that, here, Kolcraft delayed in bringing this

litigation and, as a result, is not entitled to prejudgment interest. R. 427, Def.'s Opp. Prejudgment Int. at 3.

The one year that passed between the issuance of the '993 patent in May 2008 and the filing of this lawsuit in June 2009 does not justify forgoing prejudgment interest. *See Bio-Rad Labs, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 968 (Fed. Cir. 1986) (holding that a complaint filed one year after the first instance of infringement did not represent undue delay). This case is distinguishable from those in which the Federal Circuit declined to award prejudgment interest. For example, in *Crystal Semiconductor Corp.*, the patentee waited two years after discovering infringement before suing the defendant. 246 F.3d at 1344. There was also persuasive evidence that the delay was in fact both a business and litigation tactic, as the patentee sent letters to dozens of other companies about potential infringement before setting its sights on the defendant. *Id.* at 1362. Considering this, the Federal Circuit determined that the "delay was self-serving and resulted in prejudice to the defendants." *Id.*

There is nothing like that here. There is no evidence that Kolcraft unreasonably delayed suing Artsana to bolster its litigation position or pad its bottom line. Nor is there evidence that Artsana was prejudiced in any unusual way by Kolcraft's decision to wait one year to file suit. *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988) (delays by the patentee do not justify denying prejudgment interest "absent prejudice to the Defendants"). Moreover,

Artsana contributed to the delay when it moved for reexamination of the patent. There is no basis to deny prejudgment interest.

The parties also disagree about the appropriate prejudgment interest rate to apply. Kolcraft urges the Court to apply the prime rate and to compound interest monthly. Pl.'s Mot. Prejudgment Int. at 4. Artsana, on the other hand, argues that prejudgment interest should be based on the T-bill rate and compounded annually. Def.'s Opp. Prejudgment Int. at 4-8. "A trial court is afforded wide latitude in the selection of interest rates and may award interest at or above the prime rate." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991) (cleaned up). Although relevant, a patentee is not required to show that it borrowed at the prime rate, or higher, in order to win prejudgment interest at that rate. *Id.* In any event, Kolcraft has provided some evidence that it had to borrow money at a rate higher than the prime rate on at least three occasions between 2008 and 2013. R. 429.3, Koltun Aff. ¶¶ 5-6. This is persuasive evidence that the prime rate should be applied.

The Court is not persuaded by Artsana's argument that the T-Bill rate is appropriate because there is little risk of Artsana defaulting on its obligations. Although Artsana's parent company appears to be well funded, the judgment will be imposed on *Artsana*, not the parent company. And even if that was not the case, the evidence that Kolcraft borrowed at a rate higher than the prime rate is enough to justify the prime rate, regardless of Artsana's ability to pay, because the evidence establishes a "causal connection between [the] borrowing and the loss of the use of

the money awarded as a result of [Artsana's] infringement." *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997); *see also Chamberlain Group, Inc. v. Techtronic Industries Co., Ltd.*, 315 F.Supp.3d 977, 1015-16 (N.D. Ill. 2018) (awarding prejudgment interest at T-bill rate because the patentee made no showing that it borrowed money at a higher rate or what that rate was).

Finally, contrary to both parties' request, interest will be compounded *quarterly*. In its license agreement with Kolcraft, Graco committed to making quarterly payments in the event it sold any of its allegedly infringing products. DTX-251, Graco License Agmt ¶ 7(c). Artsana should be held to the same parameters. Because neither party calculated the total amount of prejudgment interest based on the prime rate compounded quarterly, the parties shall file a joint statement on the correct amount by September 16, 2019.

### E. Motion for Enhanced Damages, Attorney's Fees, and Post-Judgment Interest

Kolcraft's last motion is a request for enhanced damages, attorneys' fees, and post-judgment interest. Pl.'s Mot. Enhanced Dam. Beginning with its first request, enhanced damages are reserved for "egregious cases of culpable behavior." *Halo Elecs.*, 136 S. Ct. at 1932. Even when a jury returns a verdict finding willfulness, enhanced damages are not automatic. *WCM Indus., Inc. v. IPS Corp.*, 721 Fed. App'x 959, 972 (Fed. Cir. 2018). "As with any exercise of discretion, courts should continue to take into account the particular circumstances of each case in deciding whether to award damages, and in what amount." *Halo*, 136 S. Ct. at 1933. In light of this, many courts turn to the nine factors laid out in *Read Corp. v. Portec, Inc.*, to help them

determine whether enhanced damages are warranted. 970 F.2d 816, 827 (Fed. Cir. 1992); *see Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382-83 (Fed. Cir. 2017).

Here, four of the *Read* factors support awarding enhanced damages, one weighs against it, and four are neutral and have no effect on the analysis. Beginning with those factors that weigh in favor of enhanced damages, the first factor in *Read* is "whether the infringer deliberately copied the ideas of another." *Read Corp*, 970 F.2d at 827. This question must be answered yes, because the jury credited Koltun's testimony that he notified Artsana about the patent and its likely infringement of it, yet Artsana kept selling the products. The second factor is "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." *Id.* This is a subjective analysis. *WCM Indus., Inc.*, 721 Fed. App'x at 972. The jury, when they found in favor of willfulness, determined that Artsana did not have a good-faith belief that the patent was invalid or that they were not infringing it. This makes sense when Artsana never presented opinion testimony from its patent counsel supporting its invalidity argument. Pl.'s Mot. Enhanced Damages at 6.

The sixth factor is the duration of the misconduct. *Read Corp*, 970 F.2d at 827. According to the verdict, Artsana willfully infringed Artsana's products from 2009, when it was notified of the patent, until 2016, when Artsana discontinued the infringing Lullaby products. That is a long time to be willfully infringing a patent, so this factor also weighs in favor of enhanced damages. Lastly, the seventh factor,

remedial action by the defendant, also supports an enhanced damages award, albeit slightly. *Id.* Artsana did redesign its original Lullaby play yard several times, but all of the redesigned models continued to infringe the existing patent. In fact, the jury found that the redesigns continued to *willfully* infringe the patent. So factors 1, 6, and 7 all weigh in favor of enhanced damages.

On the other hand, the fifth factor—the closeness of the case on the question of willfulness—weighs against enhanced damages. *Read Corp*, 970 F.2d at 827. The determination of willful infringement in relation to Artsana's original design—which they continued to manufacture after Koltun notified them of the patent—is a relatively easy call. But Artsana made major changes to its product in October 2009, when it introduced a version with a new hub. R. 301.1, Longnecker Dec. ¶¶ 14-23. These redesigned versions of the product were represented by PTX-8 and PTX-9 at trial. Although the jury ultimately found that Artsana did not undertake these redesigns in good faith, the issue was highly disputed and a rational jury could have gone the other way.

Factors three, four, eight, and nine are all neutral. Kolcraft argues that the third factor—litigation misconduct—weighs in favor of enhanced damages because Artsana caused "great cost and disruption to Kolcraft and this Court" for a number of different reasons. Pl.'s Mot. Enhanced Damages at 7-11; *see Read Corp*, 970 F.2d at 827. None of the reasons put forth by Kolcraft justify increasing the damages award. First, Kolcraft argues that the trial was improperly delayed when Artsana was given extra time to depose Bernatowicz. Pl.'s Mot. Enhanced Damages at 7-8.

Kolcraft omits the true underlying cause of the delay: *Kolcraft*'s request to submit a late supplemental report from Bernatowicz. If anyone is to blame for the delay, it is Kolcraft. Second, although Artsana pursued its non-infringement defense in the face of strong contrary evidence, the argument was not frivolous. *Id.* at 8. Next, Artsana's request to stay the litigation pending resolution of the reexamination, although ultimately denied, was not an improper litigation stall tactic. *Id.* at 8-9. Finally, Kolcraft's remaining arguments all amount to accusations that Artsana misled either the Court or the jury. *Id.* at 9-11. None of the examples Kolcraft provides amount to litigation misconduct, and they all seem relatively minor in light of the contentious relationship between the parties.

The fourth factor—Artsana's size and financial condition—also has no impact on the strength of the argument for enhanced damages. *Read Corp*, 970 F.2d at 827. It is worth noting that the parties also discussed Artsana's financial condition when arguing Kolcraft's motion for prejudgment interest. Def.'s Opp. Mot. Prejudgment Int. at 6; R. 429, Pl.'s Reply Mot. Prejudgment Int. at 10. There, Artsana argued that the financial condition of its parent company should be factored into the Court's assessment, while Kolcraft argued the opposite. The parties reversed their arguments in the briefing on enhanced damages. Pl.'s Mot. Enhanced Damages at 11; R. 454, Def.'s Resp. Mot. Enhanced Damages at 13-14. No matter. Like the motion for prejudgment interest, the Court is unpersuaded that Artsana's parent company is relevant to this analysis. There will be no judgment against the parent company, and Kolcraft has not argued that the corporate veil should be pierced to hold the parent

liable. It is Artsana's financial condition that is at issue here. Artsana is far from a small business, but Kolcraft has presented no evidence that it is a multi-billion-dollar operation like its parent. For that reason, this factor neither strengthens or weakens the case for enhanced damages.

The eighth and ninth factors both relate to Artsana's infringement—whether it was driven by a motivation to harm and whether Artsana attempted to conceal its behavior, respectively. *Read Corp*, 970 F.2d at 827. Neither of these factors sway the analysis in one direction or the other. Although it is true that Artsana and Kolcraft were direct competitors, it is not clear that Artsana sought to harm Kolcraft specifically when it began producing the Lullaby products. It instead appears that it was motivated by a general desire to increase sales and profits. Kolcraft also withdrew its product from the market shortly after Artsana introduced its Lullaby line, meaning there was no longer market share to poach directly from Kolcraft. Likewise, Artsana did not blatantly conceal its infringement. Kolcraft points out that Artsana must have considered its redesigns insignificant because it did not notify consumers when they were implemented, and Messner described the changes as "invisible to consumers." Trial Tr. at 514:9-11. But Artsana's decision not to widely publicize its redesign is not indicative of an attempt to conceal. Consumers are unlikely to purchase more than one mobile play gym. The need to notify consumers of changes in design is greatly diminished for this reason. So this factor is neutral as well.

To sum up, the *Read* factors weigh slightly in favor of enhancing damages here. The strongest factors supporting enhanced damages are intentional copying and, most of all, the duration of the infringement. Ultimately, however, the *Read* factors are not exclusive—the bottom line is always to examine the circumstances of the particular case. Here, with the *Read* factors weighing only slightly in Kolcraft's favor, there is a unique circumstance that dictates, in the Court's view, rejection of enhanced damages: the jury's decision to use the 7.7% royalty rate. Although the Court has rejected the need for a new trial on damages, the rate still resulted in almost a half-million dollars more compensation than what Kolcraft asked for. This premium amount outweighs the slight advantage that the *Read* factors give to Kolcraft; the balance flips back in favor of declining enhanced damages.

Next is Kolcraft's request for attorneys' fees. Pl.'s Mot. Enhanced Dam. at 14-15. Section 285 provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The Supreme Court has explained that an "exceptional" case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). In determining whether to award attorneys' fees, a court should consider "the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as

between winner and loser." *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986).

This case is not exceptional enough for the award of attorney's fees. It is not enough to simply point to the verdict on willfulness and demand attorneys' fees; there must be additional evidence that the case is unusual. *Stryker Corp. v. Zimmer, Inc.*, 837 F.3d 1268, 1279 (Fed. Cir. 2016). Although Kolcraft's victory at trial was decisive, the overall case—especially on the redesigned versions of the Lullaby product—was relatively close. And the case was not, in the grand scheme of things, litigated in such an unreasonable manner that fee-shifting is justified. Yes, the parties were certainly and unnecessarily contentious, and Artsana has taken a kitchen-sink approach to many issues. But Artsana and its counsel did not act in a manner that made this case stand far enough apart from other high-stakes, high-cost litigation. For these reasons, attorneys' fees are not warranted.

Finally, Kolcraft asks for post-judgment interest. Pl.'s Mot. Enhanced Dam. at 15. Artsana did not bother to respond to this request, even to explain that they concede the point. A professional presentation would have included at least a footnote acknowledging this request and conceding it, instead of forcing the Court to check, double-check, and triple-check that it was not addressed at all. Not surprisingly, Kolcraft's request is granted. The Court awards Kolcraft post-judgment interest from September 4, 2018 to the date of payment. Interest is computed daily at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the

Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment, and shall be compounded annually.

## IV. Conclusion

The Court denies Artsana's motions for judgment as a matter of law and motion for a new trial. Kolcraft's motions for a permanent injunction and prejudgment interest are granted. As noted earlier, the parties' joint statement on the amount of prejudgment interest is due by September 16, 2019. Prejudgment interest applies at the prime rate, compounded quarterly. Kolcraft is also awarded post-judgment interest, but no enhanced damages or attorneys' fees shall be granted.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 6, 2019